**The ANDERSONS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 540–82L.**

United States Claims Court.

Feb. 28, 1985.

John D. Conner, Jr., Washington, D.C., for plaintiff; McKenna, Conner & Cuneo, Washington, D.C., of counsel.

Diane L. Donley, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## MEMORANDUM OPINION

YANNELLO, Judge.

This case comes before the court under the Federal Insecticide, Fungicide, and Ro-

denticide Act (FIFRA or the Act), 7 U.S.C. §§ 136 *et seq.* (1982). The facts in this case are essentially the same, and involve the same form of agreement, as those discussed in this court's opinion in *Lebanon Chemical Corp. v. United States,* 5 Cl.Ct. 812 (1984), as clarified by order found at 6 Cl.Ct. 503 (1984).

In the *Lebanon* opinion, *supra,* the issue involved only storage costs incurred by plaintiffs as a result of the government's delay in designating disposal sites. In the instant case, this issue is present together with the issue of transportation costs incurred by plaintiff in shipping its collected stocks of pesticides (including its own stocks and those of its distributers and retailers) to the site eventually designated by the agency for the disposal. Plaintiff contends that its costs were unduly high because the government breached its agreement by failing to designate a *convenient* location for acceptance and disposal of the pesticide by the government.

## I. *Storage Costs*

■ For the reasons set forth in the *Lebanon* opinion, *supra,* plaintiff is entitled to recover storage costs; the court rejects defendant's contentions in this regard for the reasons set forth in that opinion.

## II. *Transportation Costs*

The relevant portions of the statutes, regulations, and the parties' agreement with respect to designation of disposal sites and transportation costs are set forth in the Appendix to this opinion.[1]

FIFRA obligates EPA (the agency) to establish procedures for the storage and disposal of pesticides for which registrations have been cancelled. Where, as here, cancellation is preceded by a suspension (due to the possibility of an imminent health hazard), the owner of the pesticide may request the agency to accept, "at convenient locations for safe disposal", its stock of the pesticide. The agency's obligation to accede to such a request is predicated on the fact that a registration has been suspended prior to the full panoply of cancellation proceedings.

The threshold question in this case is the definition of the term "convenient location" in the Act itself. Given the circumstances in which the agency's obligation arises, one criterion must be the convenience of the owner. Inasmuch as the owner must pay the cost of transporting the pesticide to the designated location (and inasmuch as there is no statutory provision for reimbursement of this expense by the government), the proximity of the location of the acceptance site to the owner's stock of the pesticide is one concern.

The government argues that the convenience of the owner is not the sole criterion. This is clear from the words of the statute. The location must also be convenient "for safe disposal." This, in turn, means that the needs of the government must be considered. The acceptance location may be limited to areas with safe disposal facilities on-site (or, at least, a location from which the government can accomplish safe disposal). It is possible that the number of owners and the quantity of pesticide involved in requests for acceptance may influence the convenience of the government.[2]

---

1. The relevant provisions are quoted in detail in the Appendix and are summarized as necessary in the text of the opinion. The Appendix, due to its volume, is not designated for publication with the opinion, although it is an official part thereof.

   For the convenience of the reader, it is noted that the statute in issue is found at 7 U.S.C. § 136q(a); the legislative history at S.Rep. No. 970, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 3993, 4092, 4126; *accord:* S.Rep. No. 838, 92nd Cong., 2d Sess. *reprinted in* 1972 U.S.Code and Cong. & Ad.

News 3993, 4020; and the regulations at 40 C.F.R. § 165.5 (1979).

2. Absent any further agreement between the owner and the government, the agency might well face requests for the acceptance of any quantity of pesticide from any number of distributors, retailers, and registrants, and in many disparate locations (proximate to the owner). Safe disposal or safe and economical additional transportation facilities may not be available to the government at such locations and the mere logistic feasibility of the circumstances may

The need to accommodate both of these interests, which is implicit in the statute itself, may well be the basis for the express language of the regulation (40 C.F.R. § 165.5 (1978)) providing that when registration cancellation meets the requirements, the regional administrators will confer with owners for purposes of arranging a "mutually convenient location" for acceptance.

■ In short, the statute requires consideration of the convenience of both the owner and the government. Among the factors to be considered are proximity to the owner (who will bear the cost of transporting the pesticide to the designated depot) and safety and feasibility of disposal for the government.

The correctness of the government's weighing of these factors in an effort to carry out the statute with respect to any and all owners of pesticides other than the plaintiff herein is not at issue. This court need not, and does not, decide whether the government's designation of a single disposal site in Alabama meets the requirements of the statute with respect to pesticide owners generally.

Here, the parties indeed were not governed by the statute and regulations alone, but had entered into a settlement, contractual in nature, for pesticide disposal. Plaintiff alleges that this agreement has been breached by the government's designation of a single disposal site in Alabama—far from plaintiff's place of business—and thus it is the terms of the agreement which are of paramount interest in this case.[3]

The agreement in issue refers to the agency's designation of disposal sites in the plural, not singular. The agreement encompasses a plan whereby the agency would designate disposal sites and the registrant would report the quantities of pesticide to be transported to each of the designated sites. If a particular site could not be used with respect to designated quantities, the agency and the registrant were to agree upon alternate sites (presumably from the sites initially designated or indeed any others which might be agreed upon). Clearly these terms of the agreement envision that a multiplicity of disposal sites would be designated by the government.

Moreover, the agreement contained provisions which required that the designation of disposal sites be mutually convenient for both the owner and the government. For example, we look to appendices to the agreement which were incorporated therein by reference. In Exhibit 1 to the agreement, the retailers would turn over their stocks to distributors and request that the location of that transfer be deemed the convenient location for government acceptance or, if not, that the distributor and/or Andersons would be authorized to confer with EPA to agree upon another mutually convenient site. In Exhibit 2, the distributors in turn relinquish their stocks to Andersons and request that the location of that transfer be deemed the convenient location for acceptance by the government or, if not, that Andersons were authorized to confer with EPA to agree upon another mutually convenient site. Finally, in Exhibit 3, Andersons, as registrant, would request that the convenient site for acceptance be the location where the stocks had been delivered to it by its retailers and/or distributors; Andersons were, of course, as noted above, authorized by retailers and

---

warrant the agency's taking into consideration, in determining convenience, coordination of the many requests from the individual owners in widespread locations.

**3.** The agreement in issue was part of an administrative settlement of the parties' contentions and its execution provided a procedure whereby all disputes were resolved. The government is correct in noting that, in resolving the merits of a case, evidence concerning settlement negotiations aimed at resolving the dispute in issue is customarily inadmissible.

However, where, as here, it is the breach of the terms of the settlement agreement itself which is in issue, it is indeed appropriate to examine the terms of the agreement itself and, if necessary for a fuller interpretation of the agreement, the negotiations or background leading up to the execution of the agreement.

distributors to confer with EPA to agree upon other mutually convenient sites.

Thus, the agreement provided that the government designate disposal sites which were mutually convenient for its own safe disposal and for the owner. The agreement between these two parties required, over and above the terms of the statute and regulation, that this mutuality be arrived at as between the two specific parties to the agreement and with respect to the disposal of this plaintiff's specific inventory. Proximity and economy to the plaintiff was clearly one factor to be taken into account in designating the disposal sites.

The government cannot contend here that the above interpretation of the agreement is incorrect since it is in precise accord with the contemporaneous understandings and intentions of government officials themselves at and around the time that this agreement, and several similar agreements, were entered into.

The agreement in issue was executed on October 24, 1979.

In a memorandum of July 12, 1979 (just three months before the instant agreement was executed), the agency's Deputy Assistant Administrator for Pesticide Programs, Mr. Johnson, advised Regional Administrators of other similar agreements having been entered into whereby the agency agreed to arrange and pay for pesticide disposal. He further noted the creation of a task force for carrying out the agency's role under these agreements. He stated that information was being gathered concerning the disposal of these pesticides, any interim collection sites, and "possible disposal sites" noting that such sites "are located in all ten [agency administrative] regions". (Plaintiff's Motion for Summary Judgment, Exhibit 2.) Regional Administrators were asked to cooperate in these endeavors.

By memorandum of January 21, 1980, (plaintiff's motion, Exhibit 4) Mr. Jellinek advised the Deputy Administrator of the progress of the task force, including on-going studies as to methods of disposal (*e.g.*, land based and at sea). While additional data was being gathered, Mr. Jellinek noted that the schedules initially anticipated were not being met (resulting in increased storage cost as discussed above). This memorandum also noted the requirement that the agency designate disposal sites, again in the plural. Mr. Jellinek further indicated that a procurement package was being prepared to contract with appropriate disposal facilities for the disposal of the pesticide.

That the agency contemplated disposal sites mutually convenient to both the owner and the government is also clear from a memorandum advising regional administrators regarding those owners who may not have entered into specific agreements with the government. In a memorandum of July 31, 1980, Mr. Jellinek, the agency's Assistant Administrator for Pesticides and Toxic Substances, advised Regional Administrators with respect to procedures for acceptance of pesticides whose owners had not entered into agreements with the agency but were governed by the statute and regulations alone. Mr. Jellinek advised the Regional Administrators that they were to adopt procedures suited to their individual needs, consistent with applicable regulations, but did note some headquarters' suggestions, as follows:

First, a Region could arrange for the direct transfer of the cancelled product, by its owner, to an appropriate disposal facility (e.g., a secure land fill), convenient for both EPA and the pesticide owner, where the material could be properly disposed of.

Second, the Region could arrange for the acceptance of the cancelled product at an appropriate, temporary, storage facility where it can be held by the Region or the owner until arrangements can be made for its permanent disposal. (Plaintiff's Reply Brief, exhibit A–5.)

Mr. Jellinek also noted that regions may wish to make use of the disposal arrangements being coordinated by the headquarters as part of its nationwide program (presumably dealing with those pesticides

whose owners had entered into agreements with the agency).

Clearly those registrants who entered into agreements with the agency, in an effort to more efficiently and effectively collect all outstanding stocks of the pesticides, were entitled to have disposal sites designated which were at least as convenient as those which would be designated for those owners who did not participate in any agreement with the agency. Non-participating owners were assured, both by the regulations and by the contemporaneous advice of agency officials, of a disposal site mutually convenient. So too were those owners who entered in the agreement here in issue, by the very terms of that agreement.

As can be seen by the events following the execution of this agreement, as recorded by government officials themselves, the government clearly failed to give plaintiff the individual attention required by its agreement with plaintiff, nor did the government make any attempt whatever to designate sites which would be mutually convenient for both of the parties to the agreement. Rather, the government undertook to perform taking into account its nationwide concerns including the need to dispose of large quantities of pesticides in the hands of many owners, located throughout the country. However appropriate such action may have been under the statute, the agency failed to live up to the terms of the specific agreement which it executed with plaintiff here.

An account of the procurement activity intended to obtain disposal sites for the pesticides which the government was accepting was summarized at 45 Fed.Reg. 60,483 (1980). (Plaintiff's motion, Exhibit 5). That summary indicated that, in February 1980, a Request for Proposals (RFP) was issued and, when no acceptable proposals were received, a second RFP was issued in March 1980. After evaluating the proposals submitted in response to this second RFP, the EPA determined that one facility met all of the requirements—the site located in Emelle, Alabama.

It was to that one site in Alabama that plaintiff here was required to transport the pesticide which it owned and that which it had collected from its retailers and distributors. Plaintiff alleges that this site was not convenient and that its designation violated the terms of the parties' agreement. The court agrees.

As indicated in the Federal Register and in Mr. Jellinek's memorandum of January 1980, both cited above, the agency foresook its individual and specific obligations with the plaintiff as signatory to the agreement in issue. The situation is perhaps best expressed by Mr. Jellinek himself when he stated in his memorandum of January 1980, *supra:*

This process has been complicated by the fact that even as work was being conducted to implement the earliest agreements, new agreements were being signed with other registrants which added new products, larger quantities, and more storage sites to already complex logistical and technological problems. (It is clear that *all* of the collected pesticides should be disposed of in just two major operations, since disposal under several, relatively small, individual contracts with registrants would not be practical or economical.)[4] [Emphasis in original; footnote supplied.]

Under the agreement, disposal sites were to be designated which would be convenient to both parties (proximate for plaintiff and safe and feasible for defendant). These narrower concerns, mandated by the parties' agreement, were foresaken by the

4. The difficulties eventually recounted by the agency were, if not known at the time the agreement was entered into, at least foreseeable. These difficulties did not arise due to the terms of the agreement in issue, but rather as a result of the combination of efforts undertaken by the agency nationwide.

Similarly, any difficulties which might have arisen under the government's unique procurement process were likewise not unforeseeable; and the absence of potential bidders would not absolve the government from damages resulting from its breach of the agreement with plaintiff.

agency in its larger nationwide concern. However well-intentioned the agency may have been in designating a single site, taking into account larger national concerns and its statutory duties, it is clear that this was not the basis upon which the individual parties here entered into their agreement. Plaintiff here was afforded no input whatever in determining the disposal site which was to be mutually convenient.[5]

It remains to be decided (1) where a mutually convenient site might have been, and (2) the difference between transportation costs to the actual Alabama site and those costs which would have been incurred to the mutually convenient site. Both of these matters are best considered in connection with subsequent proceedings on quantum.

## CONCLUSION

■ Based on the foregoing, plaintiff's Motion for Summary Judgment is GRANTED. The plaintiff, under the terms of its agreement, was entitled to have disposal sites designated which were mutually convenient. This, in turn, means that plaintiff was obligated, by virtue of the terms of its agreement with the agency, to incur trans-

portation expense only to the nearest available disposal site which could safely and feasibly accommodate *its* stocks of pesticides, wholly apart from considerations as to disposal of other pesticides across the nation pursuant to the agency's responsibility or duty under either the statute alone or any agreement with other registrants.

Having so concluded, it is now appropriate to turn to a consideration of transportation cost damages, that is: the difference between costs which plaintiff may have properly incurred as defined above and those which it did incur in transporting its pesticide to the designated Alabama site. Similar attention should be given to the quantification of storage costs. The parties are instructed to confer and to advise the court within 30 days regarding further proceedings appropriate to resolve the issue of damages.

---

**5.** Attached as Exhibit 1(D) to plaintiff's Motion for Summary Judgment is a letter of October 7, 1980, indicating plaintiff's attempt to explore at least one site alternative to Alabama. For reasons not yet clear, this attempt was to no avail.

*See also* fn. 3 and the Conclusion, concerning damages.